UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


DISTRICT 17, UNITED MINE WORKERS
OF AMERICA, and LOCAL UNION NO.
9177, UNITED MINE WORKERS OF AMERICA,

     Plaintiffs


v.                                    CIVIL ACTION NO. 2:03-0274


EASTERN ASSOCIATED COAL CORP. d/b/a
COLONY BAY COAL COMPANY,

     Defendant


MEMORANDUM OPINION AND ORDER

     Pending are the parties' cross motions for summary
judgment.  In their motion filed September 4, 2003, plaintiffs
seek vacatur of the February 28, 2003, arbitration award rendered
by Jane Minnich.  In its motion filed September 5, 2003,
defendant seeks the Minnich award's enforcement.


I.


     On March 28, 2003, plaintiffs instituted this action
pursuant to Section 301 of the Labor Management Relations Act

("LMRA"), 29 U.S.C. § 185.  The dispute arises out of defendant's use in 2002 of an outside contractor to remove iron sludge from a sediment pond.  The controversy is governed by the 2002 National Bituminous Coal Wage Agreement ("Agreement"), a collective bargaining accord effective from January 1, 2002, through December 31, 2006.  (Pls.' Mem. in Supp. at 2; Def.'s Mem. in Supp. at 3).

Plaintiffs contend that Minnich ignored the express terms of the Agreement and the arbitral precedent interpreting it.  Defendant contends the award is not subject to vacatur and requests enforcement.

II.

Colony Bay Coal Company ("Colony Bay"), a surface coal mining operation, is a joint venture between Eastern Associated Coal Corporation ("Eastern") and Charles Coal Company.  It is presently directed by Eastern, a subsidiary of Peabody Holding Company.  (Arb. Dec. at 2).  Colony Bay is a member of the Bituminous Coal Operators Association and a separate signatory to the Agreement.  (Id.)  Colony Bay's hourly, classified employees are represented by the plaintiffs.  (Id.)

2

In spring 2002, Colony Bay negotiated with Charlie's Pumping Service, a contractor unaffiliated with plaintiffs, to remove iron sludge with a vacuum truck from a body of water known as the Padded Pond ("the pond"). (Id. at 2). During the arbitration, Colony Bay's witnesses, Nancy Arritt, a labor relations consultant, and Timothy Bower, senior manager of mining engineering for Eastern's Contract Services Group, explained the nature of the pond. According to the testimony, the pond is essentially an environmental or sediment pond that serves to collect water flowing across the surface area of the mine. (Id.) Although not a coal slurry containment, the pond collects coal waste, limestone, rock dust, and any other material present on the mine surface, in accordance with the regulations and directives of the West Virginia Department of Environmental Protection ("WVDEP"). (Id. at 2-3). Indeed, Arritt conceded the pond has coal waste in it. (Id. at 3). It is not connected with any coal preparation facility. (Id.)

Plaintiffs' witnesses additionally testified that Colony Bay employees have, for a number of years, cleaned the pond using a backhoe and dump truck. (Id.) As noted, the vacuum truck was first used in spring of 2002, when Colony Bay contracted with Charlie's Pumping Service to remove the iron

3

sludge. (<u>Id.</u>) Bower testified that the pond had an unacceptably low pH level and a high iron content, necessitating corrective action. (<u>Id.</u>) As a result of chemical treatment, the iron sludge had settled to the bottom of the pond. (Id.) According to Bower, specialized, vacuum cleaning was necessary to avoid re-agitation of the settled iron into the water.[1] (<u>Id.</u>) Arritt and Joseph Benedict, an environmental specialist with Eastern, concurred with Bower concerning the unique nature of the spring 2002 cleaning, which required the use of the vacuum truck that neither Eastern nor Colony Bay owned. (<u>Id.</u>)

On June 21, 2002, Eddie Kincaid, a Union Local No. 9177 member, executed a standard grievance form. He alleged that Colony Bay used the contractor in derogation of the Agreement, which, it is contended, reserves pond cleaning activity to the Local. The parties proceeded to arbitration. On February 28, 2003, arbitrator Minnich concluded that although the pond contained coal waste within the meaning of Article IA(a), Colony Bay had not violated the Agreement. Plaintiffs seek to vacate the Minnich award. Defendant seeks enforcement.

---

[1]Bower testified that agitation of the iron would potentially result in an environmental "situation" and the issuance of a citation by the WVDEP. (Arb. Dec. at 4.)

4

III.

A.    The Standard of Review

        Our court of appeals has frequently identified the

polar star guiding any court confronted with a vacatur or

enforcement request:   "[J]udicial review of arbitration awards is

extremely limited -- in fact, it is 'among the narrowest known to

the law.'" U.S. Postal Service v. American Postal Workers Union,

AFL-CIO,   204 F.3d 523, 527 (4th Cir. 2000) (quoting Union Pac.

R.R. v. Sheehan, 439 U.S. 89, 91 (1978) (internal quotation marks

omitted); see also District 17, UMWA v. Island Creek Coal Co.,

179 F.3d 133, 136-37 (4th Cir. 1999); Westvaco Corp. v. United

Paperworkers Int'l Union AFL-CIO, 171 F.3d 971, 974 (4th Cir.

1999) ("Absent the most unusual of circumstances, courts must

uphold and enforce arbitral awards."); Apex Plumbing Supply, Inc.

v. U.S. Supply Co., Inc., 142 F.3d 188, 193 (4th Cir. 1998);

Mountaineer Gas Co. v. Oil, Chemical & Atomic Workers Intern.

Union, 76 F.3d 606, 608 (4th Cir. 1996) ("[T]he judiciary is to

presumptively favor the award's validity. . . .[A]bsent any fraud

by the parties or dishonesty by the arbitrator, an arbitrator's

findings should never be overturned."); Island Creek Coal Co. v.

District 28, UMWA, 29 F.3d 126, 129 (4th Cir. 1994); Norfolk &

Western Ry. Co. v. Transportation Communs. Int'l Union, 17 F.3d

5

696, 700 (4th Cir. 1994); <u>District 17, UMWA v. Apogee Coal Co.</u>,
13 F.3d 134, 138 (4th Cir. 1993); <u>Zady Natey, Inc. v. United Food
and Comm. Workers Int'l Union, Local No. 27</u>, 995 F.2d 496, 498
(4th Cir. 1993).

     The court of appeals has likewise noted that "[w]hen
the parties bargain for an arbitrator's construction of a
contract, 'the courts have no business overruling him because
their interpretation of the contract is different from his.'"
<u>United States Postal Serv. v. American Postal Workers Union,
AFL-CIO</u>, 204 F.3d 523, 527 (4th Cir. 2000) (quoting <u>Enterprise
Wheel</u>, 363 U.S. at 599); <u>see also</u> <u>District 17</u>,179 F.3d at 137;
<u>Westvaco</u>, 171 F.3d at 975; <u>Island Creek</u>, 29 F.3d at 129; <u>Zady</u>,
995 F.2d at 497-98.  "Indeed, 'as long as the arbitrator is even
arguably construing or applying the contract and acting within
the scope of his authority, that a court is convinced he
committed serious error does not suffice to overturn his
decision.'" <u>U.S. Postal</u>,  204 F.3d at 527 (quoting <u>United
Paperworkers Int'l Union v. Misco, Inc.</u>, 484 U.S. 29, 38 (1987));
<u>see also</u> <u>Rock-Tenn Co. v. United Paperworkers Int'l Union
AFL-CIO</u>, 184 F.3d 330, 337 (4th Cir. 1999) (observing "A court
'should not reject an award on the ground that an arbitrator
misread the contract" if "the arbitrator is even arguably

6

construing or applying the contract.'") (quoted authority omitted); see also District 17, 179 F.3d at 137; Westvaco, 171 F.3d at 975; Champion Intern. Corp. v. United Paperworks Intern. Union, AFL-CIO, 168 F.3d 725, 728 (4th Cir. 1999); CSX Transp., Inc. v. United Transp. Union, 29 F.3d 931, 933, 938 (4th Cir. 1994); Norfolk & Western, 17 F.3d at 700; Zady, 995 F.2d at 497-98. Among other things, the court is bound to unquestioningly accept the arbitrator's factual findings. District 17, 179 F.3d at 138.

The supporting rationales behind this laissez-faire policy are quite compelling. For example, "[i]f courts were allowed to delve into the merits of an arbitration award, then the federal policy of settling labor disputes by arbitration would be seriously undermined." U.S. Postal, 204 F.3d at 527; see United Steelworkers of Am. v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596 (1960); see also District 17, 179 F.3d at 137; Westvaco, 171 F.3d at 974, 977. A review and enforcement scheme that employed "'judicial second-guessing . . . would transform a binding process into a purely advisory one, and ultimately impair the value of arbitration for labor and management alike.'" U.S. Postal, 204 F.3d at 527 (quoting Westvaco, 171 F.3d at 974 (some internal quotation marks omitted)); Apex, 142 F.3d at 193.

7

As one might gather from the foregoing discussion, "[a] court sits to 'determine only whether the arbitrator did his job -- not whether he did it well, correctly, or reasonably, but simply whether he did it.'" U.S. Postal Service v. American Postal Workers Union, AFL-CIO, 204 F.3d 523, 527 (4th Cir. 2000) (quoting Mountaineer Gas, 76 F.3d at 608). In Mountaineer Gas, our court of appeals provided guidance for a reviewing court attempting to determine if the job was done:

> When determining whether the arbitrator did his job, this court examines: (1) the arbitrator's role as defined by the CBA; (2) whether the award ignored the plain language of the CBA; and (3) whether the arbitrator's discretion in formulating the award comported with the essence of the CBA's proscribed limits.

Mountaineer Gas, 76 F.3d at 608.

Despite the admonition to tread lightly during the review process, implicit in these three guideposts from Mountaineer Gas is the fact that the deferential review process is yet infused with some limits. One paramount consideration for a reviewing court is the rule that the contents of the applicable collective bargaining agreement control, without supplementation by the arbitrator.[2] See U.S. Postal, 204 F.3d at 530, 527

---

[2]Our court of appeals, however, has not limited arbitrators
                                        (continued...)

("Parties to a collective bargaining agreement get what they bargain for -- no less and no more. If the APWU wished probationary employees to have access to the grievance procedure to challenge a separation, it could have bargained for such a right. Indeed, the APWU remains free to bargain for this right in the future. But the APWU cannot gain through arbitration what it could not acquire through negotiation."); Westvaco, 171 F.3d at 978; Mountaineer Gas, 76 F.3d at 608.

Indeed, our court of appeals has additionally observed that an arbitrator's award "'is legitimate only so long as it draws its essence from the collective bargaining agreement.  When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.'" U.S. Postal, 204 F.3d at 527 (4th Cir. 2000) (quoting Enterprise Wheel, 363 U.S. at 597); see also District 17, 179 F.3d at 137; Westvaco, 171 F.3d at 975; Champion, 168 F.3d at 728; Island Creek, 29 F.3d at 129.

---

[2](...continued)
to the explicit language of the contract, recognizing the interpretive role of the neutral arbiter.  See Rock-Tenn Co., 184 F.3d at 337 (upholding arbitration award because "The collective bargaining agreement can fairly be read as the arbitrator interpreted it . . . ."); Norfolk & Western Ry. Co. v. Transportation Communs. Int'l Union, 17 F.3d at 701 ("This assumption of an incidental power was well within the Board's discretion, as the parties had effectively ceded to the arbitrators the task of defining the scope of their power by providing in the contractual language little guidance to the arbitrators as to their powers.").

At its core, the requirement that the award draw its essence from the parties' agreement means that "'[t]he arbitrator may not ignore the plain language of the contract.'" U.S. Postal, 204 F.3d at 527 (quoting Misco, 484 U.S. at 38); Champion, 168 F.3d at 729 ("One way to test the validity of an arbitration award on this basis is to ask 'whether the award ignored the plain language of the [collective bargaining agreement].'") (quoted authority omitted).

Hearkening back to the second factor of the Mountaineer Gas inquiry, "[w]hen the arbitrator ignores the unambiguous language chosen by the parties, the arbitrator simply fails to do his job." U.S. Postal, 204 F.3d at 527 (quoting Enterprise Wheel, 363 U.S. at 597); see also Mountaineer Gas, 76 F.3d at 610; Champion, 168 F.3d at 729; Norfolk & Western, 17 F.3d at 700. In sum, the arbitrator is "'confined to interpretation and application of the collective bargaining agreement.'" U.S. Postal, 204 F.3d at 527 (quoting Enterprise Wheel, 363 U.S. at 597); Champion, 168 F.3d at 728.

When an arbitrator strays from the language of the applicable collective bargaining agreement, he must face the specter that he allowed his personal views to interfere with his

neutral role.  Such an overspill is often fatal to an award, in view of the well-settled proposition that "[a]n arbitrator does not have carte blanche . . . to 'dispense his own brand of industrial justice.'" U.S. Postal, 204 F.3d at 527 (quoting Enterprise Wheel, 363 U.S. at 597); see also District 17, 179 F.3d at 137; Westvaco, 171 F.3d at 975; Champion, 168 F.3d at 728; Mountaineer Gas, 76 F.3d at 610 ("By fashioning an entire new remedy and infusing his personal feelings and sense of fairness into the award, the arbitrator created an award that failed to draw its essence from the CBA . . . ."); Island Creek, 29 F.3d at 129.

     In addition to the naked language of the applicable collective bargaining agreement, the arbitrator is also generally charged with considering accumulated arbitral precedent.  See CSX Transp., 29 F.3d at 939 ("clear evidence of past practice and "common law of the industry" must be considered by the arbitrator.").  This requirement is particularly significant in most coal arbitration cases in view of the inclusion of Article XXIII(k) within the Agreement:

     (k) Prior Agreement

     All decisions of the Arbitration Review Board [("ARB")]
     rendered prior to the expiration of the National
     Bituminous Coal Wage Agreement of 1978 shall continue
     to have precedential effect under this Agreement to the

> extent that the basis for such decisions have not been
> modified by subsequent changes in this Agreement.

(Agreement, Art. XXIII(k)[3]; see also District 17, 179 F.3d at 138

n.1 (observing that, via Article XXIII(k), ARB decisions are

"[i]ncorporated into the" Agreement)[4]; Island Creek Coal Co. v.

Local Union 1640, 28 F. Supp.2d 994, 998 (W.D. Va. 1998) (noting

"the ARB decision . . . has the same authority as the language of

the Agreement . . . ."); Clinchfield Coal Co. v. District 28,

UMWA, 45 F. Supp.2d 513, 515 (W.D. Va. 1998) (stating under a

nearly identical provision that "ARB decisions apparently are

binding precedent.").

Nevertheless, when confronted with an allegation that

an arbitrator intentionally ignored binding precedent, a

---

[3]One commentator has noted that "[t]his provision has
contributed to the continuing uniformity of coal decisions."
Calvin W. Sharpe, A Study of Coal Arbitration Under the National
Bituminous Coal Wage Agreement Between 1975 and 1990, 93 W. Va.
L. Rev. 497, 590 (1991). Although it experienced an abbreviated
life span, the decisions of the ARB appear to have a positive and
profound effect on arbitration under the Agreement. Id. at 502-
03 ("While the ARB issued only 207 decisions during its seven
year tenure, available evidence shows that the ARB was
influential in producing greater consistency in arbitral decision
making under the Agreement. The residual influence of ARB
decisions has continued and increased since the expiration of the
1978 Agreement. . . . Remarkable is the residual impact of ARB
precedents, reflected in the increasing adherence of panel
arbitrators to those decisions since 1981.").

[4]District 17 is the only published decision from our court
of appeals that discusses Article XXIII(k).

12

reviewing court may consider whether the omission was in fact of the significance attributed to it by the challenger.  See District 17, 179 F.3d at 141 (4th Cir. 1999) ("Because the facts on which these two arbitrators made their determinations were not the same, we find that ARB 78-24 was inapplicable here. Arbitrator Ross was correct in making his own factual findings and fashioning a unique award.  The facts with which he was presented were unique and required individual treatment. . . . Because we think ARB 78-24 did not apply here, Arbitrator Ross' refusal to rely on it was proper and does not prove that his award was premised on his own notions of justice.").

One further consideration is apropos in the review and confirmation setting.  District 17 observed that concepts of waiver play a role once the case reaches the district court. District 17, 179 F.3d at 140 ("This Court has held that when a party consents to arbitration it cannot attack the award on grounds not raised before the arbitrator.").

B.   The Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and

13

admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).  In opposing each other's motion for
judgment, neither Eastern nor the unions allege that there exist
genuine issues of material fact.

IV.

A.   The Plaintiffs' Contentions and Their Analysis

Plaintiffs submit three primary arguments in seeking
vacatur of the award.  First, they assert the arbitrator ignored
the Agreement's language concerning their work jurisdiction in
matters involving the handling and removal of coal waste.
Second, they contend the arbitrator erred in concluding the
spring 2002 cleaning amounted to exceptional "Repair and
Maintenance Work" outside plaintiffs' work jurisdiction.  Third,
plaintiffs insist the arbitrator ignored binding ARB precedent.

Regarding the first contention, plaintiffs assert that
the arbitrator "ignored the plain language of the contract
establishing the jurisdiction of the UMWA for the handling and
removal of coal waste" (Def. Rep. at 1), found at Article IA(a):

14

(a) Work Jurisdiction

The production of coal, including removal of overburden
and coal waste, preparation, processing and cleaning of
coal and transportation of coal (except by waterway or
rail not owned by Employer), repair and maintenance
work normally performed at the mine site or at a
central shop of the Employer and maintenance of gob
piles and mine roads, and work of the type customarily
related to all of the above shall be performed by
classified Employees of the Employer covered by and in
accordance with the terms of this Agreement.
Contracting, subcontracting, leasing and subleasing,
and construction work, as defined herein, will be
conducted in accordance with the provisions of this
Article.

(Agreement, Article IA(a)).  Defendants contend that, because the

spring 2002 cleaning was "Repair and Maintenance Work", the

arbitrator correctly determined that Article IA(g)(2) applied:

(g)(2) Contracting and Subcontracting

Repair and Maintenance Work — Repair and maintenance
work of the type customarily performed by classified
Employees at the mine . . . shall not be contracted out
except . . . where the Employer does not have available
equipment . . . to perform the work at the mine . . . .

(Id., IA(g)(2)).

The arbitrator noted at the outset that "there is no

dispute that the . . . [pond] is what the parties routinely refer

to as an environmental or sediment pond. . . . The pond has no

direct link to the coal production plant and is not the recipient

of the coal slurry or sludge that is typically deposited in coal

15

slurry ponds." (Arb. Dec. at 8). In view of this finding, the arbitrator additionally found that the spring 2002 cleaning was not governed by that portion of Article IA(a) addressing "production of coal." Although she did not cite the decisions, she observed that "numerous arbitrators have held that the removal of sediment from environmental ponds does not constitute coal waste as contemplated by . . . the Agreement." (Id. at 9). She noted that the conclusion was appropriate because no evidence was presented linking the pond to a coal production plant. (Id.) Based as it is upon the language of Article IA(a), the arbitrator's interpretation is not subject to attack.

Regarding the second argument, the arbitrator found that the spring 2002 cleaning qualified as a proper subject for outside contracting under Article IA(g)(2). (Id. at 9.) "Repair and Maintenance Work" may only be performed by classified employees, with the exception noted by defendant and quoted above under Article IA(g)(2). The exception provides that the work may be done by outside contractors if the employer does not have available the equipment necessary to perform the job. The record conclusively establishes that the spring 2002 cleaning was non-routine and could only have been accomplished with a vacuum truck, a piece of equipment defendant did not own. The resultant

16

finding by the arbitrator to that effect, and her ensuing interpretation, both draw their essences from the Agreement and are likewise not a proper ground for vacatur.

Regarding the plaintiffs' third argument, they contend that several binding ARB decisions and certain arbitration decisions which form the "common law of the shop" were presented to the arbitrator and inadequately discussed. They note that although the arbitrator discussed some of the arbitration decisions in detail, she ignored binding ARB precedent referred to in Article XXIII(k).[5]

---

[5]It is noted that ARB decision 78-24 establishes that prior, non-ARB arbitration decisions may yet be treated as having preclusive effect under certain circumstances. One strict requirement, however, is that the two cases under consideration involve the same fact situation. That type of determination is not often capable of precise boundaries. The court notes the arbitrator discussed some potentially preclusive precedent in the award. Although some cases were left undiscussed, the court notes they involved ponds of a type different from the pond presently under consideration. As noted by our court of appeals, the preclusive effect of a prior arbitral award is itself a question for the arbitrator. Little Six Corp. v. United Mine Workers of Am., 701 F.2d 26, 29 (4th Cir. 1983). The court has no basis to conclude the arbitrator did not properly review the non-binding arbitral precedent provided to her.

Plaintiffs additionally contend the arbitrator ignored prior settlements relating to the issue of pond cleaning. At page 8 of the award, however, the arbitrator provided reasoning for her finding that the prior accords did not control the matter before her.

17

There are essentially four ARB decisions cited by plaintiffs that were entered before the expiration of the 1978 agreement.[6] None of those decisions are applicable under the circumstances here. First, plaintiffs maintain that in ARB 9, "the [b]oard . . . noted that to allow the contracting out of handling of coal waste at issue on the basis of not having equipment would conflict squarely with the exclusive work jurisdiction of the UMWA." (Pls.' Resp. at 3-4). This alleged notation is conspicuously absent from the referenced decision. ARB 9 addresses the maintenance of "gob piles," which Article IA(a) specifically reserves to classified employees. The ARB concluded that maintenance of the gob piles did not fall under Article IA(g) inasmuch as it was an "expressly-listed item and that the definition of who is to perform the work involved in it is of precise delineation." (ARB 9 at 5). There is no such "precise delineation" with respect to pond maintenance. ARB 9 is thus properly rejected as having any necessary application here.

_____

[6]One of the ARB decisions offered by plaintiffs was made in March of 1981. Neither party has offered evidence of the date of expiration of the 1978 Agreement. The court's review of authority suggests that the 1978 Agreement was in effect through June 6, 1981. United Mine Workers of America International Union v. G.M.&W. Coal Co., 642 F. Supp. 57, 59 (W.D. Penn. 1985). Because defendant has not objected, the court will consider all four decisions.

18

Plaintiffs next offer ARB 185.  That decision also addresses the permissibility of assigning contractors to maintain gob piles at coal preparation plants.  It thus meets the same fate as ARB 9.  Of greater significance, however, is the following statement found in ARB 185:

> Without agreeing or disagreeing with any of the rationale expressed in the Panel Arbitrator's Opinion, we affirm the result reached in the opinion based upon the specific facts before the arbitrator.

(ARB 185 at 2).  This same language, which likewise appears in the third ARB decision submitted by plaintiffs, number 367, substantially diminishes any precedential value they might otherwise possess.[7]

The fourth decision, ARB 78-79, is closer to the present factual circumstances.  That decision too, however, is distinguishable.  The dispute underlying ARB 78-79 involved a "settling" pond cleaning project preparatory to the building of a larger pond.   Like this action, the company had initially

---

[7]ARB 367 is also factually distinguishable.  The decision addressed pond cleaning at a preparation facility.  In that decision, the ponds were built primarily as an emergency dump site for "thickener" waste from the plant.  (ARB 367 at 4).  The ponds also contained accumulated sludge.  (Id.)  Although the ARB there found that the company was not relieved of its obligation to use classified employees by reasons that it did not possess necessary equipment, Article IA(g) did not apply because the coal waste in the ponds was determined to have resulted from coal preparation.

assigned this and related jobs to its classified employees. The employees in ARB 78-79 attempted for six weeks to excavate the drained pond, but the company's equipment continued to lodge in the mud. Eventually, the company retained an outside contractor to perform the work. The outside contractor completed the job using five men, a drag line, two dump trucks, and a bulldozer. Approximately two feet of "settlings" were removed from the pond, which had accumulated at its bottom over a 12 year period.

The grievants contended they had jurisdiction over the work because it included the removal of coal waste. The company contended the removal of the sediment was only incidental to the construction of a larger pond area. The company additionally noted that the pond water was pumped directly from the mine and hence not a by-product of any processing operations. Despite the incidental removal of coal waste, and the employees' inability with their existing equipment to do the job, the arbitrator, and subsequently the ARB, determined that the excavation of the pond amounted to the removal of coal waste and not "Repair and Maintenance Work" excepted by Article IA(g)(2). The arbitrator wrote:

> Repair and maintenance work under the contract
> generally refers to repairs and maintenance of the
> mechanical equipment and tools used in the mining and
> processing operations and the coal related facilities.
> The work is customarily done in the mine itself or at
> the central shop. The work in question in the present

20

> case did not involve any mechanical equipment or tools
> of the mining operation but only the removal of certain
> materials from the bottom of the pond.
>
> The materials that were removed . . . included
> coal fines and other solids contained in the water from
> the mine. However, since this water went directly from
> the mine to the pond, the [c]ompany did not consider
> the material in the water as coal waste. . . . [S]uch a
> definition is too narrow and does not take into account
> of all the various ways in which coal waste may be
> generated. . . . [T]he term "coal waste" includes the
> waste produced during both the coal production and
> processing operations.

(Pls.' Reply, App. 1, Att. B).

Regarding the issue of coal waste, one notes initially

that the primary purpose behind the excavation in ARB 78-79 was

to remove that material in the process of enlarging the pond.

The arbitrator found the excavation to the bottom of the pond to

have resulted in the removal of coal waste, a conclusion with

which the ARB simply stated it had "no reason to differ . . . ."

(Id. at 2).  Specifically, the ARB stated "The Arbitrator found

that the materials that had settled out of the water and which

had been pumped from the mine over the course of several years

included coal fines and other solids."  (Id.)  The ARB then

quoted the arbitrator further, and made the concluding

observation:

> If the fines at the bottom of the pond had
> been recovered for sale, that recovery work
> would be included within the meaning of the

> term 'coal production' because coal would be
> being produced for the market.  On the other
> hand, if the Company chose not to recover the
> coal from the bottom of the pond, but to
> dispose of it, it would be considered waste.
> In either event, however, the work would
> still be under the jurisdiction of the
> classified employees under Article IA,
> Section (a) . . . .

This was a reasonable approach to the definition.  The
finding is that the term "coal waste" is broad enough
to accommodate the material at issue here.

(Id. at 2-3).

The foregoing discussion reveals a number of
distinguishing features between this action and the dispute
underlying ARB 78-79.  First, removal of the coal waste at issue
in ARB 78-79 was a key objective in the overall scheme of
enlarging the pond.  Here, however, the primary purpose of the
vacuum truck was to remove, with minimal disturbance of the
water, accumulated iron sludge that was apparently poised to
result in an environmental violation.

Second, the quantity of coal waste removed from the
pond in this case appears to have been incidental.  Although the
plaintiff has left the matter largely up for speculation, it
would appear coal waste particles were adrift in the water,
perhaps in some quantity, and that they were captured by the
vacuum truck along with the targeted iron sludge, which had

22

settled out as a layer at the bottom of the pond following chemical treatment. In ARB 78-79, an apparently more significant removal was at issue, namely, two feet of coal settlings that accumulated at the bottom of the pond over the course of more than a decade.[8]

Third, ARB 78-79 did not place its explicit imprimatur on the narrow interpretation of "Repair and Maintenance Work" offered by the arbitrator. Indeed, the decision did little more than note the arbitrator's finding in that regard as part of his resolution of the unique set of facts before him. As already observed, the arbitrator in this case explained why the pond cleaning constituted "Repair and Maintenance Work" beyond the plaintiff's work jurisdiction.

Finally, the pond in ARB 78-79 was explicitly designed as a settling pond for water pumped directly from the mine. This purpose appears to have a much tighter link to coal production than the circumstances relating to the pond at issue here, which was used merely to control surface runoff.

---

[8]It is indeed questionable how much coal waste was in the pond here in view of the arbitrator's finding that the pond was not the recipient of "sludge that is typically deposited in coal slurry ponds." (Arb. Decis. at 9).

23

As <u>District 17</u> observes, ARB decisions are

"[i]ncorporated into the" Agreement by Article XXIII(k).

<u>District 17</u>, 179 F.3d at 138 n.1. Once incorporated, our court

of appeals' decision in <u>Clinchfield Coal Co. v. District 28,</u>

<u>UMWA</u>, 720 F.2d 1365 (4th Cir. 1983) becomes operative:

> Indeed, it seems that a reasonable interpretation of
> that clause might require a contrary result. Where, as
> here, the arbitrator fails to discuss critical contract
> terminology, which terminology might reasonably require
> an opposite result, the award cannot be considered to
> draw its essence from the contract.

<u>Id.</u> at 1369 (emphasis supplied). <u>U.S. Postal</u>, 204 F.3d at 527

(quoting <u>Misco</u>, 484 U.S. at 38) (noting the arbitrator is

prohibited from "'ignor[ing] the plain language of the

contract.'"). Based upon the multiple distinguishing factors

between this action and ARB 78-79, however, it is apparent that

the arbitrator did not fail to discuss critical contract

terminology that might reasonably have required an opposite

result. The award draws its essence from the Agreement.

V.

For the reasons stated herein, it is ORDERED as

follows:

1.    That the February 28, 2003, award be, and it

hereby is, enforced;

24

    2.    That defendant's motion for summary judgment be, and it hereby is, granted;

    3.    That plaintiffs' motion for summary judgment be, and it hereby is, denied; and

    4.    That this action be, and it hereby is, dismissed and stricken from the docket.

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record and the arbitrator.

DATED:  September 19, 2006

John T. Copenhaver, Jr.
United States District Judge